David H. Bundy
DAVID H. BUNDY, P.C.
310 K Street, Suite 200
Anchorage, AK 99501
(907) 248-8431
Attorney for Debtor


## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

In Re:                                          )
                                                )
ANCHORAGE SPORTSPLEX, INC.,                      )          Case No. A-10-00475
                                                )
                                                )          Chapter 11
                                                )
                        Debtor.                  )
_____)


## MOTION TO DETERMINE TAX LIABILITIES PURSUANT TO 11 U.S.C. § 505 (a)

Anchorage Sportsplex, Inc., Debtor and Debtor-in-Possession, moves pursuant to 11 U.S.C. §505(a) to determine the liability of the Debtor for real estate taxes to the Municipality of Anchorage on its leasehold and improvements for the years 2008 through 2010, and also to determine the correct valuation of its leasehold and improvements for tax assessment purposes for the year 2010, and in support thereof states as follows:

1.      Debtor is an Alaska non-profit corporation; it has a board of directors but no equity owners or members. Debtor owns and operates an inflatable sportsdome in Anchorage, which has become a conspicuous feature on the local landscape as it is one of the largest such structures in existence. "The Dome," as it is popularly called, is

used by a wide variety of sports and community groups especially during the long Alaska winter season. The Dome measures 601 x 290 feet and contains a full size competition soccer field surrounded by a running track. Additional information can be found at www.thealaskadome.com.

2.      The Dome occupies a portion of the property originally developed for the Alaska Seafood plant on Raspberry Road near Minnesota Boulevard. The plant itself was purchased by Grace Alaska d/b/a ChangePoint ("CP"), an affiliate of which, Anchorage Community Development LLC ("ACD") owns the fee interest in the Dome property, and has leased it to ASI on a 50 year ground lease.

3.      Development and construction of the Dome cost about $10.5 million. The 50 year leasehold cost $1.2 million up front. Reserves, prepaid interest and very substantial bond issuance costs brought the total project to $13.9 million, of which $11.5 million was raised by the issuance of tax-exempt bonds to a group of mostly institutional investors.

4.      The Debtor has not been able to meet the required debt service payments on its bonds, and has filed this case in order to reorganize its debt structure so that it can continue operations.

5.      Since the construction of the Dome, ASI and ACD, as the owners and taxpayers, have been in a dispute with the Municipality of Anchorage on whether the dome improvements and the underlying land qualify for municipal property tax exemption under AS 29.45.030 based on:

a.      For the years 2008 through 2010:

Motion to Determine Tax Liabilities – Page 2

      i.   The property being used exclusively for non-profit, charitable or educational purposes by ACD and the Debtor;

      ii.   Neither ACD nor the Debtor having a dominant profit motive in rental/use of the property; and

      iii.   The rent/user fees are incidental to and reasonably necessary for the exempt use of the property and do not exceed the operational requirements of the exempt activities.

b.    For the years 2008 through 2009, the Municipality's denial of exemption was based on its failure to include ACD, which the Municipality regards as the real party in interest, in any of the administrative proceedings (conducted without the involvement of ACD and its representatives), resulting in a failure of due process and consequent failure to develop the administrative record documenting ACD's exempt activities.

6.    There is an additional dispute regarding the tax assessed value of the improvements for the year 2010. The Debtor claims that the Municipality based its 2010 assessment of the improvements on fundamentally wrong principles of valuation, including:

      i.   Failing to consider the taxpayers' depreciated cost method valuation testimony and specifically the supporting MAI appraisal report;

      ii.   Failure of Municipality to value the improvements using the income approach method that the Municipality apparently applies to all other recreational properties, resulting in unequal treatment of ACD and the Debtor vis a vis other similarly-situated taxpayers;

      iii.   Failure of Municipality to consider the taxpayers' income approach valuation method testimony and the two appraisals documenting that approach; and

      iv.   Failure of Municipality to properly apply the depreciated cost method; the Municipality's depreciated cost assessment failed to take into account external depreciation, which if properly

accounted for would have substantially lowered the assessment of the improvements.

7.     Section 4.1 of the ground lease between the Debtor and ACD imposes on the Debtor the obligation to pay all real property taxes assessed against the property, including the improvements, the Debtor's leasehold interest, and the underlying fee simple interest owned by ACD. Because the Municipality has a statutory first lien to secure payment of real property taxes, the amount owed to the Municipality for past taxes, and the amounts required to be paid in the future, directly affect the funds which would otherwise be available to pay the bondholders and other creditors. Therefore resolving the outstanding tax issues is one of the keys to designing a reorganization plan. In round numbers, if the Municipality prevails the tax obligation will be approximately $200,000 per year. If the property is taxable, but the Debtor wins the valuation argument, the tax could be cut in half.

8.  In order for this case to be resolved, a number key players must reach agreement or reach a judicial solution: the Debtor and the bondholders must determine the amount of secured debt, the payment terms, and the treatment of the unsecured deficiency; the bondholders and the CP/ACD parties must determine the amount and duration of CP/ACD's obligation to guarantee the Debtor's operating losses; and the Debtor/ACD taxpayers and the Municipality must determine the taxable status and taxable value of the Dome property.  The reorganization will be accomplished more efficiently and less expensively if all of these disputes can be heard and decided in one forum, and § 505 (a) is one of the tools provided to enable some of the disputes impacting the Debtor to be brought before the court best designed to resolve them in

the context of the bankruptcy case. Having all the key players involved with the Chapter 11 process could make it easier to reach a consensual plan; if no consensus is reached, there will still be efficiencies in presentation of evidence and inconsistent rulings can be avoided.

9.   Section 505 (a) does not allow this Court to determine tax issues which have already been adjudicated elsewhere, or if the period for contesting the tax has expired, but neither of these limitations applies in this case. The dispute over tax exemption for 2008 – 2010 is currently before the Superior Court in case no. 3AN-09-9894, an administrative appeal which the Debtor has asked to convert to a trial de novo. The dispute over the property's assessed value for 2010 is currently still at the administrative level on a motion for reconsideration of the denial of the taxpayers' challenge to the initial valuation. So this Court will not, by taking on the issues, be disturbing any decision otherwise final under Alaska law.

10.   The Ninth Circuit has an expansive view of the bankruptcy court's ability to decide issues under § 505 (a). *In re Mantz*, 343 F3d 1207 (9th Cir 2003) deals with a bankruptcy court's determination of the debtors' liability for sales taxes which had been determined pre-petition by the California State Board of Equalization, but the decision was not final. The state argued that the bankruptcy court did not have jurisdiction to deal with the issue because of the prior SBE ruling, and the bankruptcy court agreed, but the Ninth Circuit held the bankruptcy court did have jurisdiction:

> We recognize that the legislative history to *§ 505* gives some indication that Congress anticipated that a decision of at least the United States Tax Court reached after the commencement of a bankruptcy proceeding would be binding on the bankruptcy

court. "If [the bankruptcy court lifts a stay on the Tax Court proceedings, and] the Tax Court reaches its decision before the bankruptcy court's decision on the tax claim against the estate, the decision of the Tax Court would bind the bankruptcy court under principles of *res judicata* because the decision of the Tax Court affected the personal liability of the debtor." 124 Cong. Rec. 32,414 (1978). Where the text of a statute is clear, however, we need not consult legislative history. *Ratzlaf v. United States, 510 U.S. 135, 147-148, 126 L. Ed. 2d 615, 114 S. Ct. 655 (1994)* ("We do not resort to legislative history to cloud a statutory text that is clear."). The text of *§ 505(a)(1)* plainly authorizes the bankruptcy court to determine a debtor's tax liability "whether or not" previously adjudicated.

We therefore hold that the bankruptcy court is not required by *§ 1738* to give preclusive effect to the state tax liability determination in this case. The bankruptcy court maintains the power under *§ 505(a)(1)* to redetermine the Mantzs' tax liability, but the exercise of such power is discretionary. "Any number of courts have observed that *§ 505(a)(1)* is a permissive empowerment--as established by the operative verb 'may.' It is not a mandatory directive. The assumption of the power is discretionary with the Bankruptcy Court." *Northbrook Partners LLP v. County of Hennepin (In re Northbrook Partners LLP), 245 B.R. 104, 117 (Bankr. D. Minn. 2000)* (citation omitted). If no purpose would be served by allowing the debtor to relitigate his tax liability, the bankruptcy court is under no obligation to allow him or her to do so. In this case, the bankruptcy court may, in the exercise of its discretion, decline to redetermine the Mantzs' tax liability--indeed, it may do so based on some or all of the reasons underlying the *res judicata* doctrine--but it is not barred by *res judicata* from considering the Mantzs' tax liability.

11.      For these reasons, the Debtor moves the Court to enter an order transferring to this court all tax disputes between the Municipality of Anchorage on the one hand, and the Debtor and ACD on the other, relating to the Dome property and the improvements thereon.

DATED this 6th day of July, 2010.

DAVID H. BUNDY, P.C.
Attorney for Debtor


By: ___/s/ David H. Bundy
          David H. Bundy

Motion to Determine Tax Liabilities – Page 6

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 6th day of July, 2010, the foregoing document was served by ECF on

- U. S. Trustee
- John Siemers, Esq.
- Eric Schaffer, Esq.
- Kathy Black, Esq.
- G Peter Hallgrimson, Esq.

By____/s/ David H. Bundy_____

David H. Bundy