John C. Siemers, Esq. ABA # 7811135
BURR, PEASE & KURTZ, P.C.
810 N Street, Suite 300
Anchorage, AK 99501
Phone:  (907) 276-6100

- and -

Eric A. Schaffer, Esq.
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Phone:  (412) 288-3131
Facsimile:  (412) 288-3063

*Counsel to U.S. Bank National Association,
as Indenture Trustee*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN RE: | Chapter 11 |
| ANCHORAGE SPORTSPLEX, INC. | Case No. 10-00475-DMD |
| Debtor. | Re:  Docket Nos. 21, 22, 43, 111, 113 |

**POST-TRIAL MEMORANDUM IN SUPPORT OF OBJECTION OF U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE, TO MOTION OF ANCHORAGE COMMUNITY DEVELOPMENT, LLC TO COMPEL PAYMENT OF REAL PROPERTY TAXES AND FOR ADEQUATE PROTECTION**

U.S. Bank National Association (the "Trustee"), as indenture trustee, submits this post-trial memorandum in support of its objection to the motion (the "Motion") of Anchorage Community Development, LLC ("ACD") for an order compelling Anchorage Sportsplex, Inc. (the "Debtor" or "ASI") to pay certain real property taxes and for adequate protection.

### INTRODUCTION

Under controlling Ninth Circuit precedent, the Lease Agreement (the "Lease") between ASI and ACD is not a "lease" as that term is used in section 365(d)(3) of the Bankruptcy Code.

US_ACTIVE-104866183.5

See City of San Francisco Market Corp. v. Walsh (In re Moreggia & Sons, Inc.), 852 F.2d 1179 (9th Cir. 1988). Under Moreggia, the central question is whether the parties to the Lease created a traditional landlord-tenant relationship. In its trial memorandum, the Trustee set forth compelling evidence that, despite the form of the Lease, the Dome was a common enterprise or de facto joint venture and the Lease was merely part of a broader scheme to finance and operate the Dome for the mutual benefit of ASI and the CP Group.[1] Testimony presented in Court strongly supports the analysis and conclusions in the Trustee's trial memorandum. Because the parties did not have a traditional landlord-tenant relationship and the economic substance of the transaction does not bring the Lease within section 365, the Motion must be denied.

Because ACD cannot deny the many non-traditional elements of the relationships here, it seeks to avoid the legal framework established by the Ninth Circuit. Similarly, during the evidentiary hearing, ACD avoided facts it found unhelpful or inconvenient and instead offered evidence generally irrelevant to the analysis required under Moreggia.

In the interest of economy and efficiency, the Trustee does not restate all of the facts and analysis set forth in its trial memorandum. This post-trial memorandum is intended to supplement the Trustee's trial memorandum, focus on the relevant facts and applicable law, and respond to ACD's arguments.[2] Applying the appropriate legal standard to the relevant facts, it is clear that ACD and ASI do not have a typical landlord-tenant relationship, and the Lease is not a

---

[1] All capitalized terms used but not otherwise defined herein have the same meaning as in the *Trial Memorandum in Support of Objection of U.S. Bank National Association, as Indenture Trustee, to Motion of Anchorage Community Development, LLC to Compel Payment of Real Property Taxes and for Adequate Protection*, filed at Doc. No. 111.

[2] For the Court's convenience, the Trustee has attached as **Appendix A** a timeline of events containing relevant facts and citations to the record.

- 2 -

"lease" for purposes of section 365(d). ACD cannot seize upon the form of the Lease to gain the extraordinary protections and priority provided by section 365 to the detriment of other creditors.

## ARGUMENT

**A. Under controlling Ninth Circuit precedent, the Court is required to analyze state *and* federal law to determine whether the transaction qualifies as a Lease under section 365(d) of the Bankruptcy Code.**

Moreggia established a two-part inquiry to determine whether a transaction constitutes a "lease" for purposes of section 365(d)(3). See Moreggia, 852 F.2d at 1182. First, the Court must determine whether the agreement is a lease for purposes of state law. Id. If the agreement is a lease under state law, the Court must take an additional step and determine whether the transaction qualifies as a lease under section 365(d) of the Bankruptcy Code. Id. "Simply meeting the state law definition of a lease will not necessarily mandate the mindless application of section 365." Id. at 1183.

Under federal law, determination of whether a "lease" exists for purposes of section 365 focuses on the economic substance of the agreement rather than its form or label. Moreggia, 852 F.2d at 1182-83; see Int'l Trade Admin. v. Rensselaer Polytechnic Ins., 936 F.2d 744, 748 (2d Cir. 1991); Liona Corp., N.V. v. PCH Assoc. (In re PCH Assoc.), 804 F.2d 193, 198 (2d Cir. 1986); City of Olathe, Kansas v. KAR Dev. Assoc., L.P. (In re KAR Dev. Assoc., L.P.), 180 B.R. 629, 636 (D. Kansas 1995). The Court must examine "*all relevant circumstances and the economic substance of the agreement to discern the true nature of the instrument.*" In re Integrated Health Servs., Inc., 260 B.R. 71, 75 (Bankr. D. Del. 2001) (citing PCH Assoc., 804 F.2d at 199) (emphasis added). Application of the economic substance test requires consideration of numerous factors, including:

    a.  whether the parties intended to enter into a typical landlord/tenant relationship;

    b.  whether the lessee solicited the lessor to invest in the property;

US_ACTIVE-104866183.5

  c. whether the property was purchased by the lessor specifically for the lessee's use;

  d. whether the "rent" was prepaid;

  e. whether the "rental" payments bore a relationship to the market value of the land;

  f. the term of the "lease";

  g. whether the lessor could recognize any benefit from appreciation in the value of the land;

  h. whether the obligations of the tenant are those normally associated with ownership;

  i. whether the lessor could exercise control over the lessee's operations;

  j. the purpose of the lease in light of the entire transaction; and

  k. whether the purposes underlying section 365 would be served by including the agreement within its provisions.

See Moreggia, 852 F.2d at 1184-86; PCH Assoc., 804 F.2d at 200-01; PCH Assoc. v. Liona Corp. N.V., 55 B.R. 273, 277-78 (Bankr. S.D.N.Y. 1985); Integrated Health Servs., 260 B.R. at 76; KAR Dev.; 180 B.R. at 639; Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency (In re Hotel Syracuse, Inc.), 155 B.R. 824, 838-39 (Bankr. N.D.NY. 1993). This non-exclusive list of factors guides the Court in determining whether a state law lease is entitled to the protections of section 365.

ACD's invitation to ignore controlling Ninth Circuit precedent and, instead, rely on a decision of the Seventh Circuit, must be rejected. See ACD Pre-Hearing Brief at 3-4 (citing United Airlines, Inc. v. HSBC Bank USA, N.A., 416 F.3d 609 (7th Cir. 2005)). Preliminarily, the determination of rights under a federal statute is a matter of federal, not state, law.[3] More

---

[3]  See, e.g., Butner v. United States, 440 U.S. 48, 55 (1979) (state law suspended to the extent that "some federal interest requires a different result"); accord Travelers Casualty & Surety Co. of Am. v. Pacific Gas & Electric Co., 549 U.S. 443, 451 (2007). As explained in KAR Dev., federal interests warrant application of a federal rule to determine whether a transaction is a "lease" under section 365(d). See KAR Dev., 180 B.R. at 638.

- 4 -

importantly, the decision in Moreggia is binding within the Ninth Circuit. As explained by the Court of Appeals in U.S. v. AMC Entertainment, Inc., 549 F.3d 760 (9th Cir. 2008):

> [I]t goes without saying that we expect our pronouncements will be the final word within the Ninth Circuit's geographical area, subject only to en banc or Supreme Court review. … [W]hen the Ninth Circuit or any of its coequal circuit courts issue an opinion, the pronouncements become the law of that geographical area. In instances where the circuits do not agree on the interpretation of a statute or a regulation, those disagreements should be resolved by the Supreme Court.

AMC Entertainment, 549 F.3d at 771 (internal citations omitted).

Disregarding Moreggia, ACD focuses almost exclusively on application of state law. For example, ACD argues that the Uniform Commercial Code and Alaska common law are dispositive with respect to whether the Lease is a "lease" for purposes of section 365(d)(3). Under Moreggia, however, analyzing the transaction under state law is only half of the inquiry. Even if the transaction is considered a true lease under state law, the Court must perform a separate analysis under federal law. ACD's arguments to the contrary are simply wrong.

**B.    The record demonstrates that the parties did not intend to enter into a typical landlord-tenant relationship, and the Lease is not the type of transaction Congress anticipated when enacting section 365(d)(3).**

The Trustee's pre-trial memorandum extensively discussed the relevant facts, and every fact was supported by citation to the exhibits and deposition transcripts which are part of the record in this case.[4] Regardless of whether the Lease is a lease under state law, it is not the type of transaction that is entitled to the extraordinary remedy and priority in payment provided by

---

[4]    The Court took under advisement the Trustee's request for admission of US Bank Exhibits 58-62. Exhibit 58 is an admission by a party-opponent and, therefore, not hearsay. Fed R. Evid. 801(d)(2). Alternatively, it comes within the exceptions for business records, present sense impressions, and statements affecting an interest in property. Fed R. Evid. 803(1, 6, 15). Exhibits 59 and 60 come within the exception for business records. Exhibit 61 is an admission by a party-opponent as well as a business record. Exhibit 62 is a public document within Fed. R. Evid. 803(8) that also reflects a present sense impression and contains statements affecting an interest in property.

- 5 -

section 365. Testimony at the evidentiary hearing only reinforced the facts established by the exhibits and deposition testimony.

The process by which ACD and ASI acquired their respective rights in the seafood plant property demonstrates their symbiotic relationship. It is entirely possible that, without each other, neither entity would have any rights to the property. In 2003, Eugene Desjarlais approached ChangePoint's pastor, Karl Clauson, to discuss construction of a sports facility on the Church's Dowling property. See Desjarlais Deposition, 14:10-14:20 [US Bank Exhibit 47]. Although this plan fell through, Clauson reached out to Desjarlais in 2004 when ChangePoint was considering acquisition of the old seafood plant. Clauson proposed that Desjarlais join the church in its bid for this property and, if the church succeeded, build the sports facility on part of the property. Scott Merriner testified that AIDEA was reluctant to sell the property to a religious organization and ChangePoint hoped to make the bid more attractive by including ASI. Desjarlais said he believed AIDEA ultimately accepted ACD's bid, in part, because it included the Dome. In this same spirit of collaboration, ASI's subsequent request that AIDEA issue conduit revenue bonds noted that AIDEA approved the sportsplex as part of its deal with ACD. See US Bank Exhibit 14.

Between the AIDEA closing in 2005 and execution of the Lease in 2006, the parties' relationship deepened and their financial futures became increasingly intertwined. Management personnel from the CP Group, including Merriner and Dave Sell, worked with Desjarlais as a team to secure financing for the Dome and formulate a business plan. See US Bank Exhibit 14. Sell called on and met with potential users, identified revenue sources, and drafted ASI's Field Rental Application/Agreement. See US Bank Exhibits 59, 60. Merriner helped ASI formulate its business plan, engaged with the underwriter, and sent emails supporting ASI's financing plan.

US_ACTIVE-104866183.5

See US Bank Exhibit 53. Indeed, it would not be credible to argue that Merriner, a highly educated, well-trained, experienced business and financial consultant, simply deferred to Desjarlais in connection with a transaction that required a $750,000 annual out-of-pocket commitment from ChangePoint and an additional donation of $3,800,000 in real property.

ASI and ACD executed the Lease in 2006 as part of a larger, comprehensive relationship involving a Management Agreement, Board restrictions, a Naming Rights Agreement, and substantial guarantees of debt, all of which gave the CP Group extraordinary control over and responsibility for the operations of ASI. The Lease contains an unusual combination of features, including a 50-year term, prepaid rent, and tenant obligations usually associated with outright ownership. The $1,200,000 delineated as "rent" in the Lease was prepaid in full as of August 1, 2006. See US Bank Exhibit 1. The prepaid rent bore no relationship to the fair market value of the land, which was $5,000,000. See Steele Deposition, 28:9 – 29:18 [US Bank Exhibit 8]. The amount of prepaid rent was related to ChangePoint's (not ACD's) need to pay for renovations and improvements to ChangePoint's facilities. See Steele Deposition, 15:17 – 15:25 [US Bank Exhibit 8]. ACD treated the 75% of fair market value not included in the prepaid rent as a charitable donation to ASI. See US Bank Exhibits 35, 44, 57.

Focusing on the Lease provisions, ACD observed that the Lease refers to ASI's obligation to pay real property taxes as "additional rent." The term "rent," however, is defined in AS 34.03.360 to mean "the uniform periodic payment due the landlord, however denominated." AS 34.03.360. It is a periodic payment made in consideration of use of a capital asset. The "additional" payments here consist of *expenses*, such as property taxes, insurance, and utilities. As Russell Minkemann testified and Rick Steele acknowledged, the taxes are not due to ACD nor are they recognized as taxable income to ACD. (The same is true for payment of insurance

and utilities.) Rather, they are paid directly to the Municipality of Anchorage. Because the real property taxes are not due to the landlord, they are not in fact payments of rent.

The term of the Lease is 50 years. See US Bank Exhibit 1. Due to the combination of the prepaid rent and the 50-year term, ACD cannot recognize any appreciation in the value of the land for 50 years. See US Bank Exhibit 57. Moreover, ASI's obligations under the Lease are those normally associated with outright ownership. See US Bank Exhibit 57. For example, ASI is obligated to pay the real property taxes assessed to the property and all utilities associated with the property, maintain the premises in good repair, and provide insurance coverage for the property. See US Bank Exhibit 1.

The Trustee submitted the expert report of Russell Minkemann who opined, based on his 30+ years of experience as a Certified Public Accountant (and review of accounting records of the CP Group and ASI), that the Lease "does not contain the indicators of a typical lease transaction." US Bank Exhibit 57 at 1. ACD offered no contrary expert opinion and, in several hours of cross-examination, was unable to contradict Minkemann's testimony. Minkemann explained that the combination of a one-time lump sum payment of "rent" and an unusually long 50-year term without some form of rent escalator "makes the transaction look like a sale rather than a lease." US Bank Exhibit 57 at 1. His conclusion is supported by Treasury Regulations 1.1031(a)-(c), which provide that a 30-year leasehold is treated as the equivalent of a transfer of property for purposes of a like kind exchange. Further, Minkemann testified and Steele confirmed that the $3,800,000 charitable contribution from ACD to ASI was booked as a current entry in ACD's financial statement, and no amount was designated on ACD's balance sheet as a deferred expense. See US Bank Exhibit 57 at 3. Treating the entire charitable contribution as a current transaction suggests that the parties viewed the transaction more as a sale. Id.

- 8 -

When executing the Lease, the parties did not intend to enter into a typical landlord-tenant relationship. The parties intended to create some common enterprise for their mutual benefit.

a. The Dome was an official GraceAlaska initiative. US Bank Exhibits 12 and 13; see Merriner Deposition, 43:24 – 44:3 [US Bank Exhibit 7]. Merriner testified that an entity becomes a GraceAlaska initiative when GraceAlaska decides to provide support, financial and otherwise.

b. Desjarlais viewed the relationship between ASI and the CP Group as a "partnership." See Desjarlais Deposition, 13:9 – 13:11; 16:2 – 16:3; 86:14 – 86:16 [US Bank Exhibit 47].

c. At the hearing, Merriner agreed that the relationship between ASI and ACD was that of a partnership. He testified that ACD sought to lend support to ASI's mission by contributing in ways that it could.

d. The GraceAlaska board agreed that "[t]he Sportsplex is central to ChangePoint's vision. … ChangePoint will certainly want to do everything possible to prevent Sportsplex from defaulting on its loan." US Bank Exhibit 15. In his testimony, Merriner admitted that the Dome advanced the mission of the church.

e. Pastor Clauson referred to the Dome as a ChangePoint facility that was an integral part of the church's marketing and membership outreach. See http://www.nytimes.com/interactive/2007/10/26/business/20071123_MEGACHURCH_FEATURE.html# (Pastor Clauson explained: "[w]hen you walk into the Dome, you don't see anything explicitly Christian, and we've found it to be working. People are coming to ChangePoint because they're asking a question – I wonder what a church is like that would build a Dome like this." Further, he remarked "if God gives us another Dome, he gives us a Dome.").[5]

f. ACD's attorney drafted the Debtor's amended bylaws so as to give GraceAlaska the power to appoint the Debtor's board members. US Bank Exhibits 13 and 17.

g. The Debtor's principal and ACD's management worked together as a team in preparing for the construction of the Dome and refining the Debtor's business plan. US Bank Exhibit 14.

h. ChangePoint and GraceAlaska guaranteed the Debtor's operating deficits and debt service payments up to $300,000 annually. US Bank Exhibit 18.

---

[5] The Trustee requests judicial notice of these admissions in accordance with Fed. R. Evid. 201 ("[j]udicial notice may be taken at any stage of the proceeding"). For the convenience of the parties, the Trustee may submit a video containing these admissions.

US_ACTIVE-104866183.5

    i. ChangePoint guaranteed the Debtor's $300,000 commercial line of credit. US Bank Exhibit 49.

    j. GraceAlaska purchased the naming rights to the Debtor's facility for $150,000 annually. US Bank Exhibit 21. ASI did not seek competitive bids for the naming rights. See Desjarlais Deposition, 72:3 – 72:22 [US Bank Exhibit 47].

    k. GraceAlaska donated management services to ASI. See Merriner Deposition, 25:15 – 25:22 [US Bank Exhibit 7].

    l. Merriner testified that the Church brand was intertwined with the Dome and, as a result, the Church's reputation was at risk if the Dome did not succeed.

    m. Many of ASI's vendors, including utilities, billed and were paid by ChangePoint or ACD. US Bank Exhibit 31.

    n. ChangePoint and GraceAlaska made payments on behalf of, and loans to, the Dome for: payroll, bond interest payments, employee benefits, electric, computer lease, postage and copying expenses, IT support, office supplies, and equipment. See Proofs of Claim 5-1 and 7, filed on October 12, 2010, by GraceAlaska and ChangePoint, respectively.

As a prelude to entering into the Lease, the CP Group invested substantial time and energy preparing ASI – an entity with no assets, no employees, no access to capital, and no management experience – to be a functional part of the ChangePoint campus. In other words, ASI needed the CP Group's assistance to finance and operate the Dome. ASI's need for assistance and the CP Group's willingness to provide it is exactly why this is not a typical lease situation. It is simply not normal for a lessor to assist a non-operating, start-up lessee by guaranteeing its debt, drafting its business plan, managing its business, taking over its accounting functions, controlling its board, and naming its facility.

GraceAlaska had the ability to, and did, exercise significant control over ASI's operations and board of directors. Under the Management Agreement, GraceAlaska was responsible for managing ASI's facility and property, administration of policies, and financial and accounting services. See US Bank Exhibit 20. ASI's Amended and Restated Bylaws empower GraceAlaska to appoint ASI's board. See US Bank Exhibit 17. Desjarlais testified that, even when

- 10 -

GraceAlaska did not actively exercise this power, he and other board members feared they would be replaced if they did not follow the CP Group's directions. ChangePoint imposed its will over ASI to the extent that "the Dome Board [had] no tangible role or impact on decisions being made at the Dome." US Bank Exhibit 29. Two ASI board members resigned as a result. See US Bank Exhibits 29 and 30. Through its control over ASI, ChangePoint succeeded in its efforts to "link the Dome to ChangePoint." See US Bank Exhibit 28.

As discussed above, the CP Group promised financial backing of at least $150,000 per year through the Naming Rights Agreement and up to $600,000 more per year through the Guaranty and Commercial Guaranty. With this amount at stake on an annual basis, in addition to the initial $3,800,000 donation of real property, it is no surprise that the CP Group wanted oversight and control from the beginning. That is why the CP Group required a management agreement and why ASI's first three managers, none of whom had experience operating a sports facility, were employees of the CP Group. That is why Merriner insisted that ASI amend its bylaws to give GraceAlaska the ability to appoint ASI's board. That is why the CP Group sent its employees on a fact-finding mission to look at other sports domes. That is why the CP Group controlled the Dome's image, down to the indoor advertising. The many different requirements served to link, not only the reputations of ChangePoint and the Dome, but also their financial well-being. This is hardly the stuff of a typical landlord-tenant relationship.

Looking at the Lease in context, it is clear that the CP Group was subsidizing and directing ASI's operations to fulfill ChangePoint's vision and mission. The Lease was one of many mechanisms used to further that goal. ACD is more like an investor or business partner than a landlord, and the Lease is not the type of transaction that is entitled to the extraordinary protections and priority in payment provided by section 365 of the Bankruptcy Code.

US_ACTIVE-104866183.5

**C.    ACD presented numerous "red herrings" intended to confuse the issues and distract from the appropriate legal analysis.**

*1.    ACD's Focus on the Distinction between a Lease and a Disguised Security Interest is Misplaced.*

In its pre-hearing brief, ACD argued that AS 45.01.201(38) and California common law, which set forth similar tests to distinguish between leases and disguised security interests, provide the relevant standard to determine whether the Lease is a lease within the scope of section 365.  As discussed above, an analysis under state law is only half of the inquiry under Moreggia and, accordingly, is in no way dispositive.  Even under a state law analysis, however, these tests are inappropriate because the Trustee does not contend that the Lease is a disguised security interest.  The Trustee previously argued that the Lease should be recharacterized under state law as a sale for a term of years or a fee simple determinable with ACD holding a reversion.⁶  Moreover, AS 45.01.201(38) distinguishes between leases of *personal* property and disguised security interests.  At issue in this case is a lease of *real* property.  Testimony tending to show that the Lease is not a disguised security interest under AS 45.01.201(38) or California common law is irrelevant.  See KAR Dev., 180 B.R. at 640 (cases involving personalty are inapplicable to contract involving real property). ⁷

---

⁶    A fee simple determinable arises where the fee interest will terminate automatically upon the happening of some stated event.  Restatement (First) of Property § 44 (1936).  A reversion is the future interest retained by a grantor when it transfers less than its entire interest and retains a right to take a present interest in the property upon the ending of the transferred interests.  Restatement (First) of Property § 154 (1936).  A subset of fee simple determinable is an estate for years, where the "stated event" consists of "the lapse of a computable period of time."  Restatement (First ) of Property § 44, cmt. k and § 19.

⁷    For these reasons, the Court should disregard as irrelevant testimony presented by ACD that:  (a) the original term of the Lease is not greater than the remaining economic life of the land; (b) ASI is not bound to become the owner of the land; (c) ASI does not have an option or obligation to renew the Lease for an indefinite time or become the owner of the land for no additional or nominal consideration; (d) ASI's payments under the Lease are unrelated to the amount necessary to amortize the bond debt; (e) ACD holds a reversionary interest; and (f) ASI is not required to make a balloon payment.

- 12 -

### 2. *ACD's Focus on the Parties' Current Relationship is Irrelevant.*

Under <u>Moreggia</u>, one of the factors considered in determining whether a Lease is a lease for purposes of section 365(d) is whether the parties created or intended to enter into a typical landlord-tenant relationship at the time the Lease was executed. See <u>Moreggia</u>, 852 F.2d 1184. At the time the Lease was executed:

   a. ASI was a GraceAlaska initiative;

   b. the CP Group had expended significant effort and resources to secure financing for the Dome;

   c. representatives of the CP Group had assisted in preparing ASI's business plan and lining up revenue sources;

   d. GraceAlaska had the ability to appoint ASI's board;

   e. ChangePoint and GraceAlaska had agreed to a limited guaranty of the bond debt and operating expenses;

   f. GraceAlaska was buying the naming rights to the facility;

   g. GraceAlaska was preparing to take on the management responsibilities for ASI; and

   h. ASI was central to ChangePoint's vision and mission.

In short, the relationship between ASI and ACD was a far cry from that of a typical landlord-tenant.

Recognizing that the parties did not have a typical landlord-tenant relationship at the time the Lease was executed, ACD offered evidence that it is not managing the property or controlling ASI's board now. ACD went to great pains to show that it made a deliberate transition of management in December 2008 and, contemporaneously, relinquished some of its control over ASI's board (although Carl Ekstrom, an employee of the CP Group, remained the President of ASI's board). For example, ACD offered testimony that ASI terminated the Management Agreement and thereafter took full responsibility for the Dome. However, there was no written termination of the Management Agreement, the ASI Board never voted to terminate the

- 13 -

Management Agreement, and no one seems to remember any specific conversation in which ASI orally terminated the Management Agreement. The likely reason why no one can remember when or how the Management Agreement was terminated is that it never was expressly terminated. The CP Group simply decided to stop exercising formal control.

This transition was not a simple admission of the shortcomings of the CP Group's management. During the transition, Merriner made a point of telling Alice Federenko that he foresaw a default on the bonds. In retrospect, it is clear that the CP Group was looking to distance itself from the Dome's anticipated default and to have someone other than ChangePoint take the lead in negotiations with the Trustee and bondholders and/or responsibility for a bankruptcy or other reorganization.

However the relationship has changed, the fact remains that the association between ASI and ACD was an informal partnership with a highly structured working relationship, treating the Dome as a joint enterprise for the mutual benefit of ASI and the CP Group. It is irrelevant that, three years after the parties created this collaborative venture, during which time the CP Group took full responsibility for management of the Dome and treated the ASI board as a "puppet," the CP Group decided, for self-serving reasons, to stop exercising control.

> 3. *ACD's Focus on Evidence Relating to Breach of Fiduciary Duty or Alter Ego Liability Confuses the Issues.*

The Court heard considerable testimony regarding two instances where the CP Group made important decisions that negatively affected ASI's business. First, the CP Group did not permit ASI to sell banner ads to raise revenue. The subsequent recession makes it difficult to quantify resulting losses. Second, and far more quantifiable, the CP Group determined that it

US_ACTIVE-104866183.5

would be best to decline ASI's $1,500,000 state grant application prior to any input from ASI.[8]
See US Bank Exhibit 24 ("After significant discussion, it was decided by all that it would be
better to decline the grant provided by the Legislature …"). A representative of the CP Group
publicly withdrew the grant on behalf of ASI. See Desjarlais Deposition, 98:19 – 99:21 [US
Bank Exhibit 47]. While ACD presented testimony apparently intended to show that these
actions did not constitute breach of fiduciary duty to ASI or otherwise subject the CP Group to
liability, breach of fiduciary duty is not an issue in this proceeding. It is irrelevant whether these
decisions were wrong, harmful, or constituted a breach of fiduciary duty.

For purposes of section 365(d)(3), it is relevant only that ACD and its affiliates had
sufficient control over ASI to be the key decision-maker with respect to these issues. Governor
Sarah Palin contacted ChangePoint, not ASI, with regard to ASI's grant request. Clearly, the
public perception was that ChangePoint controlled ASI. This perception was confirmed when
ChangePoint called a board meeting solely to discuss whether ASI's grant should be withdrawn
and subsequently pressured ASI to ratify ChangePoint's decision. This decision-making process
demonstrates that this was not a typical landlord-tenant relationship.

Similarly, testimony apparently intended to show that ASI is not an alter ego of the CP
Group or that the corporate veil between ASI and the CP Group should not be pierced is
irrelevant because these issues are not presented in this proceeding. See Ahcom, Ltd. v.

---

[8] The day after ChangePoint made the decision to decline the grant, it sought ratification from ASI's board. See ACD Exhibit 14. ASI's board minutes show no benefit to ASI from declining the grant, only deference to the CP Group. See id. ("Carl [sic] Clauson has asked Gene Desjarlais if our board would consider withdrawing the grant request. … The withdrawal of the grant request will delay several areas deemed essential toward completion of the Dome. Among these items were the security fence, turf purchase, track completion and parking area completion. Discussion also related to the immeasurable assistance provided to this Board by the Change Point organization."). Declining the state grant led to problems that the Dome still struggles with today.

Smeding, 2010 WL 4117736 (9th Cir. Oct. 21, 2010) (alter ego or veil piercing claim belongs to creditors).[9] To take the Lease outside the scope of section 365(d), it is sufficient that the relationship between ASI and the CP Group is something other than that of a typical landlord and tenant.

    *4.    ACD's Focus on Exercise of Control Rather than Ability to Control is Misleading.*

Testimony elicited by ACD to the effect that ACD never exercised its right to appoint or veto members of ASI's board, that ACD never forced the ASI Board to make a particular decision, or that ACD did not force ASI to enter into or continue operating under the Management Agreement, is irrelevant and misleading. Under PCH Assoc., it is the "landlord's" ability to control the "tenant" that matters, not whether any actual control was exercised. See PCH Assoc., 804 F.2d at 196, n. 3. Under the Debtor's Amended and Restated Bylaws, adopted in July 2006, GraceAlaska has the ability to appoint ASI's Board. It is undisputed that GraceAlaska still has this power today. Whether GraceAlaska exercised this power is irrelevant, especially in light of Desjarlais's testimony that he feared that the ASI Board would be replaced if it did not follow the direction provided by the CP Group.

Even if GraceAlaska did not formally exercise its power under the Bylaws, the existence of that power allowed the CP Group to impose its will. Desjarlais testified that the CP Group recommended at least three individuals for placement on ASI's board: Keith Lauwers, Dave Poulin, and Carl Ekstrom. ASI obliged. Clauson adamantly recommended that ASI withdrawal its grant request. ASI obliged, even though this left ASI without funds needed for construction. The CP Group suggested that GraceAlaska manage the Dome. ASI obliged, even though

---

[9]     The same is true with regard to claims for breach of fiduciary duty against parties in control of a debtor. See generally, In re Tousa, Inc., 437 B.R. 447 (Bankr. S.D. Fla. 2010).

- 16 -

GraceAlaska had no experience managing sports facilities. The CP Group decided that ASI should refrain from selling banner ads. ASI obliged, against its better judgment. Even Merriner acknowledged that the ASI board was "not fully independent" and that they merely provided "value by being the voice of the community and by being [ChangePoint's] voice into the community." US Bank Exhibit 28. The ASI board had "no tangible role or impact on the decisions being made at the Dome." US Bank Exhibit 29. In short, ASI was subservient to the CP Group and felt compelled to accept its suggestions. This is not typical of a landlord-tenant relationship

> 5. *ACD's Focus on Isolated Factors and Lease Provisions Rather than All Relevant Circumstances is a Misapplication of the Economic Substance Test.*

Under the economic substance test, courts must consider "*all* relevant circumstances … to discern the true nature of the instrument." Integrated Health Servs., 260 B.R. at 75 (citing PCH Assoc., 804 F.2d at 199) (emphasis added). The test requires a fact-intensive inquiry where no single factor is determinative. By contrast, ACD seeks to seize on isolated points, without undertaking the more comprehensive analysis required by controlling case law. For example, ACD notes that the rent payments in Moreggia were calculated to amortize debt used to finance acquisition of the property. Individual factors, however, "are not dispositive of the *sui generis* property interest embodied" in the Lease. See Moreggia, 852 F.2d at 1183. By focusing on isolated factors, ACD fails to apply the economic substance test.

At the hearing, ACD sought to avoid the effects of the economic substance test by portraying isolated lease provisions as typical. For example, ACD offered testimony that triple-net leases are not abnormal. That does not mean, however, that the Lease comes within the scope of section 365. When a triple-net lease contains a lengthy term and prepaid rent, the

economic substance of the transaction may be closer to a sale for a term of years than to a lease. See Int'l Trade, 936 F.2d at 751.

Similarly, ACD attempted to attack Minkemann's observation regarding the 50-year term of the Lease by showing him memoranda of other leases without showing him the leases themselves or offering any information as to the circumstances surrounding the lease. ACD implied that, because other long-term leases exist in Anchorage, the Lease should be considered a lease for purposes of section 365(d). This approach, however, does not accord with the comprehensive analysis required by case law. The Court must take a more comprehensive view. It is the totality of the economic substance factors that may take a transaction outside the scope of section 365. See, e.g., Int'l Trade Admin. v. Rensselaer Polytechnic Inst., 936 F.2d 744 (2d. Cir. 1991). In similar circumstances, the Second Circuit confirmed that a long lease term, by itself, "does not automatically signal than an agreement is not a true lease" for purposes of section 365(d), but in combination with other factors, such as prepaid rent and tenant obligations usually associated with outright ownership, "it may lead to such a conclusion." Int'l Trade, 936 F.2d at 749-50. The typicality of any individual factor, standing alone, does not control the economic substance analysis.

If ACD truly wanted to compare the Lease to the local Walmart leases, see ACD Exhibits 16 and 19, it should have presented evidence regarding all relevant circumstances, not just the term of the lease. Did Walmart prepay its rent? Is Walmart managed by its landlord? Did the landlord guarantee Walmart's debt or assist Walmart in obtaining financing? Does the landlord have naming rights or control Walmart's board? Probably not. This is in stark contrast to the instant case, where a host of contemporaneous contractual arrangements between the parties and a longstanding collaborative association are far more indicative of an informal partnership or a

joint enterprise than a typical landlord-tenant relationship. At the time the Lease was executed, the CP Group filled the roles of manager, benefactor, sponsor, guarantor, and controlling entity. Viewed collectively, the relevant circumstances demonstrate that the Lease is not the type of transaction and ACD is not the type of lessor that Congress anticipated when it enacted section 365(d).

## CONCLUSION

For all of the foregoing reasons and the reasons set forth in the Trustee's trial memorandum, the Trustee respectfully requests that the Court deny the relief requested in the Motion.

DATED this 12th day of November, 2010.

Respectfully submitted,

*/s/ John C. Siemers*
John C. Siemers, Esq.
BURR, PEASE & KURTZ, P.C.
810 N Street, Suite 300
Anchorage, AK 99501
Phone: (907) 276-6100

- and -

Eric A. Schaffer, Esq.
Luke A. Sizemore, Esq.
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Phone: (412) 288-3131
Facsimile: (412) 288-3063

*Counsel to U.S. Bank National Association, as Indenture Trustee*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 12th day of November, 2010, a true and correct copy of the foregoing was served on the following in the manner indicated:

**ELECTRONIC NOTICE:**

David H. Bundy, Esq.
U.S. Trustee
Kathryn A. Black, Esq.
Stanley T. Lewis, Esq.
G. Peter Hallgrimson, Esq.
Deitra L. Ennis, Esq.
Joseph H. Flack, Esq.
Pamela Weiss, Esq.

**FIRST CLASS MAIL:**

Charles F. Schuetze, Esq.
Manley & Brautigam PC
845 K Street
Anchorage, AK  99501

BURR, PEASE & KURTZ, P.C.
By:  */s/ John C. Siemers*
         John C. Siemers, Esq.

- 20 -

US_ACTIVE-104866183.5