# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:

ANCHORAGE SPORTSPLEX, INC.,

Debtor.

Case No. A10-00475-DMD
Chapter 11

**Filed On**
**12/13/10**

## MEMORANDUM  ON MOTION TO COMPEL PAYMENT OF TAXES

Anchorage Community Development's (ACD) motion to compel payment of

real property taxes and for adequate protection duly came before the court for hearing on

October 27th and 28th and November 5, 2010.  Numerous briefs and exhibits have been

submitted by ACD and U.S. Bank as indenture trustee for the bondholders.  Testimony has

also been presented.  This court has jurisdiction over the controversy pursuant to 28 U.S.C.

§ 157(b)(2)(A) and the district court's order of reference.  I conclude that ACD's motion to

compel is well taken.  It will be granted.


Background

Gene Desjarlais is an Anchorage contractor and soccer enthusiast.  Gene

actively coached youth soccer.  His children were soccer players.  As a coach and parent, he

understood the need for year-round soccer facilities in Anchorage during the winter.  Using

school district gyms for indoor soccer programs was inadequate and conflicted with other

school activities.  None of the private winter soccer gyms were much better.  Desjarlais

dreamed of a full-size indoor soccer facility.  He spent time and money trying to make his

dream a reality. Desjarlais scoured the Anchorage Bowl for a suitable site. There were very few parcels of sufficient size to accommodate his needs. He was aware that the old Alaska Seafood plant had a large undeveloped tract of land off of Raspberry Road near Minnesota. Desjarlais learned that GraceAlaska[1] was interested in purchasing the entire site. He met with Karl Clauson of ChangePoint in 2003 and 2004 to discuss possible use of raw land to build a sportsdome.

Desjarlais established Anchorage Sportsplex, Inc. (ASI) as an Alaska non-profit corporation in 2004. The Alaska Industrial Development and Export Authority (AIDEA) was to hold an auction for sale of the Alaska Seafood property on July 13th of 2004. ChangePoint, Alliance Development Corp. and ASI submitted a joint proposal for use of the property.[2] It was followed by a purchase agreement in October of 2004. Because ChangePoint was a non-profit religious entity, it could not purchase the Alaska seafood property directly from AIDEA. Anchorage Community Development, a new for profit corporation, was created in December of 2004 to complete the purchase from AIDEA. 99.9% of ACD was owned by ChangePoint. Desjarlais continued to pitch the Sportsplex project to the GraceAlaska board in early 2005.

At a GraceAlaska March 2005 board meeting the board discussed the relationship between GraceAlaska and its charitable initiatives. Sportsplex had became a

---

[1] Grace Community Church and GraceAlaska d/b/a ChangePoint are Alaska non-profit corporations. GraceAlaska owns 99.9% of Anchorage Community Development.

[2] U.S. Bank Exhibit 54.

2

GraceAlaska initiative. Attorney Stan Lewis was to amend the by-laws of Sportsplex to provide that : (1) board members were to be appointed by the GraceAlaska board; (2) the budget had to be approved by the GraceAlaska board; and (3) changes to the by-laws had to be approved by the GraceAlaska board.[3]

Following ACD's purchase of the Alaska Seafood property, Scott Merriner of GraceAlaska helped Gene Desjarlais prepare documents necessary for the financing of the Sportsplex project. Merriner and Desjarlais spoke directly with bond counsel for two hours in mid-March of 2006.[4] ASI submitted an application for AIDEA Conduit Revenue Bonds to construct the sportsdome in the spring of 2006.[5] GraceAlaska conducted a board meeting in June of 2006. The board discusssed a ground lease with Sportsplex, a naming rights contract and debt payment guarantees from GraceAlaska to the Sportsplex bondholders.[6] In a board meeting on June 27, 2006, the directors of GraceAlaska discussed a $300,000.00 annual guarantee for Sportsplex, debated GraceAlaska's exposure on the transaction, and concluded that development of Sportsplex was "[c]onsistent with the vision God gave us to have facilities."[7]

---

[3] Sportsplex adopted the amended by-laws proposed by Mr. Lewis on July 6, 2006. U.S. Bank Exhibit 17. Gene Desjarlais executed the amended by-laws as president of Sportsplex.

[4] U.S. Bank Exhibit 53.

[5] U.S. Bank Exhibit 14.

[6] U.S. Bank Exhibit 15.

[7] U.S. Bank Exhibit 16.

3

A variety of documents were executed to close the Sportsplex transaction in August.  A fifty year land lease between ACD and Sportsplex was executed on August 1, 2006.[8]  This lease provided for  upfront pre-paid rent of $1.2 million for a fifty year term.  Sportsplex was required to pay taxes and other costs associated with ownerhsip.  A guaranty agreement was executed on the same day by the GraceAlaska entities[9] in favor of Wells Fargo Bank as trustee for the bondholders.[10]   Sportsplex issued a $11.51 million note to AIDEA and a leasehold deed of trust in favor of Wells Fargo Bank, the original trustee for the bondholders on August 1, 2006.[11]  ACD executed a parking lot joint use and maintenance agreement on August 8, 2006.[12]  Grace Community Church, Inc. executed a commercial guarantee  in  favor  of  Wells  Fargo  as  trustee  on  August  11,  2006  for  the  benefit  of Sportsplex.[13]  GraceAlaska and Sportsplex entered into a management agreement on August 16th, 2006.[14]  GraceAlaska  was  to  manage  the  Sportsplex  facility.    A  naming  rights

---

[8] U.S. Bank Exhibit 1.  ACD used $1.2 million in prepaid rent to renovate the Alaska Seafood property in late 2006.

[9] The entities included Grace Community Church, Inc. d/b/a/ ChangePoint and GraceAlaska.  Both Grace Community Church and GraceAlaska are Alaskan non-profit corporations.

[10] U.S. Bank Exhibit 18. U.S. Bank has replaced Wells Fargo as trustee for the bondholders.

[11] ACD Exhibits 5 and 6.

[12] U.S. Bank Exhibit 19.

[13] U.S. Bank Exhibit 49.

[14] U.S. Bank Exhibit 20.

4

agreement was executed on August 16, 2006.[15] This agreement gave GraceAlaska the ability

to name the dome in return for payments of $150,000 per year for five years to Sportsplex.

The bond proceeds were inadequate to complete construction. In January of

2007, Sportsplex applied for a $1.5 million grant from the State of Alaska to finish the dome.

After receiving word that the governor would likely veto the project, Karl Clauson and the

Grace Community Church board decided that the application should be withdrawn. Gene

Desjarlais apparently agreed with the decision.[16] He later voiced his displeasure with Karl

Clauson over the matter, however. He felt Clauson alienated state legislators because the

legislators had been previously advised that the church did not run the dome.[17] Gene

Desjarlais then loaned $1.3 million of his personal funds to Sportsplex to complete the

dome.[18] He also arranged for an additional private $500,000 loan to cover additional

construction costs. The dome opened on October 1, 2007.

After the dome opened, ChangePoint's executive management team was to

provide direction on its operations.[19] ChangePoint's Scott Merriner was to determine the

nature of the dome as a ministry or a community non-profit. In January of 2008, he sought

---

[15] U.S. Bank Exhibit 21.

[16] U.S. Bank Exhibit 24. The Grace Community Church board minutes indicates "it was decided by all that it would be better to decline the grant provided by the legislature." Gene Desjarlais was in attendance at the meeting. On June 19, 2007 the ASI board also voted unanimously to withdraw the grant. ACD Exhibit 14. Desjarlais was on the ASI board.

[17] U.S. Bank Exhibit 32, p.1.

[18] *Id.*

[19] U.S. Bank Exhibit 25.

to unite the effort of ChangePoint's executive staff with the Sportsplex directors.[20]  This effort apparently did not bear fruit.  On February 28th, 2008, the Sportsplex board asked for clarification as to the precise relationship between Sportsplex and ChangePoint.[21]  They also felt that the church had not adequately performed its management functions under the management agreement.[22]  Merriner wrote an e-mail on April 29th, 2008 attempting to deal with issues raised by the Sportsplex board of directors.[23]  He understood that the board felt that it added no value to the project and had no authority.  The Sportsplex board sought to raise revenues by selling advertising banners in the dome.  Merriner rejected the sale of advertising banners in the dome.  He thought that the dome should be re-branded as "The Dome at ChangePoint" and linked to the church more effectively.  Following this e-mail Sportsplex board members John Sedor and Hank Swan resigned.[24]

ChangePoint eventually withdrew from the management agreement with Sportsplex.  It had not been paid any of the annual fees dues pursuant to the agreement. Through the efforts of Gene Desjarlais, Alice Federenko became the CEO of ASI in December of 2008.  She has a background in soccer.  Unfortunately, however, Sportsplex has been unable to pay taxes due the Municipality of Anchorage and service its bonded

---

[20] U.S. Bank Exhibit 26.

[21] U.S. Bank Exhibit 27.

[22] *Id.*

[23] U.S. Bank Exhibit 28.

[24] U.S. Bank Exhibits 29 and 30.

indebtedness since her employment.  This led to a Chapter 11 filing on June 5, 2010.[25]

ACD filed a motion to compel payment of real property taxes and for adequate protection on June 17, 2010.[26]  The debtor and U.S. Bank filed oppositions to the motion.[27]  At a scheduling conference held on July 14, 2010, discovery deadlines were imposed and a hearing on ACD's motion to compel was set for October 27th and 28th, 2010.[28]  Through stipulation, the time for assumption or rejection of the lease between the debtor and ACD was extended to January 1, 2011.[29]

The court heard the debtor's motion to determine tax liability on September 16th, 2010.[30]  On September 21, 2010, the debtor's motion to determine tax liability was denied; this court refused to exercise jurisdiction over tax disputes between ACD, Sportsplex and the Municipality of Anchorage.[31]

Under 11 U.S.C. § 365(a) a trustee may assume or reject any executory contract or unexpired lease with the court's approval.  "The trustee shall timely perform all the obligations of the debtor . . . arising from and after the order for relief under any

---

[25] Docket No. 1.

[26] Docket No. 21.

[27] Docket Nos. 39 and 43.

[28] Docket No. 53.

[29] *Id.*

[30] Docket No. 85.

[31] Docket No. 90.

unexpired lease of nonresidential real property, until such lease is assumed or rejected."[32]
The time for assumption or rejection has been extended to January 1, 2011.[33]  The debtor
filed for Chapter 11 relief on June 5, 2010.  2010 taxes due the Municipality were to be paid
on June 15 and August 15, 2010 in installments of $102,410.46 each.[34]  They have not been
paid.  U.S. Bank  alleges that the debtor does not have to pay taxes now because the "Land
Lease" executed by the debtor and ACD on August 1, 2006 is not a true lease within the
meaning of § 365 of the Bankruptcy Code.  Its argument is centered on the Ninth Circuit's
decision in *City of San Francisco Market Corp., v. Walsh  (In re Moreggia & Sons, Inc.)*[35]
and a number of related decisions.


Moreggia

        In the early 1960s, the city of San Francisco started the Golden Gateway
Redevelopment  Project.  The Market Corporation was created to help relocate businesses
being displaced by the project.  Moreggia & Sons, Inc. was a produce business displaced by
the project.  The Market Corporation constructed the San Francisco Produce Terminal.
Moreggia & Sons entered into an agreement for two store units in the Produce Terminal in
1962.  In 1984 Moreggia assigned its rights under the agreement to American Poultry;

---

[32] 11 U.S.C. § 365(d)(3).

[33] Docket No. 53.

[34] Exhibit B to Docket No. 22.

[35] 852 F.2d 1179 (9th Cir. 1988).

8

American Poultry in turn assigned its rights under a second identical lease for two units in the Produce Terminal to Moreggia.  The original leases covered a total term of fifty years. Rent for each of the units was $275.00 per month.  Rent was based on the funds necessary to retire Market Corporation's bonded indebtedness.  When the bonds were paid off, no further rent was required.

There were a number of additional obligations under the lease.  Moreggia was to pay parking and utility charges and a share of any taxes assessed against the Market Corporation.  If the Produce Terminal ran a deficit,  Moreggia as lessee was required to pay a pro-rata share of the losses.  Moreggia had to maintain the premises, pay membership fees to the Produce Association,  pay a share of the Produce Association's insurance costs, and provide liability and property damage insurance protection for the Market Corporation, the Produce Association and the City and County of San Francisco.

Moreggia filed for Chapter 11 relief on January 17, 1985.  Because the bonded indebtedness had been previously paid off, Moreggia had no obligation to pay basic rent.  On November 27, 1985, the case was converted to a chapter 7 proceeding.  Within 60 days of the conversion, the Chapter 7 trustee obtained an ex parte order extending the time within which to assume or reject Moreggia's leases and executory contracts.  On March 6, 1986 the trustee filed a motion to sell the lease with the Market Corporation and to assume and assign the lease if necessary.  On March 7, the Market Corporation filed a motion to reconsider the ex parte order and an opposition to the motion for sale.  It alleged that the Chapter 7 trustee had failed to assume the lease within the sixty day period of 11 U.S.C. § 365(d)(4).  As such,

9

the lease was automatically rejected and the property should be surrendered to Market Corporation.  The bankruptcy court granted the motion to sell the lease and denied Market Corporations' motion for reconsideration.  It determined that the lease was not governed by § 365(d)(4).  Market Corporation appealed.  During the appeal, the trustee sold Moreggia's interest in the two produce stalls for $210,000.  The proceeds were held in escrow pending disposition of the appeal.  The bankruptcy court's decision was affirmed by the district court.  Market Corporation then appealed to the ninth circuit.

The Ninth Circuit affirmed the bankruptcy court's decision on a number of grounds.  While conceding that the "agreement" constituted a lease under California law, it concluded that compliance with § 365(d)(4) was not appropriate for "[F]ederal law purposes of Section 365(d)(4) and the economic realities of this particular arrangement."[36]  The court cited language from a Senate Report on § 502(b)(6)[37] that raised distinctions between "true leases and a financing transaction" based upon the "economic substance of the transaction and not  . . . the form of the transaction or the fact that the transaction is denominated a lease."[38]  It agreed with other courts that concluded  "[A] proper inquiry under section 365(d)(4) is directed towards the economic substance of the transaction to determine whether

_____

[36] *City of San Francisco Market Corporation v. Walsh (In re Moreggia & Sons, Inc.)*, 852 F.2d at 1182.

[37] *Id.* citing S.Rep. No. 989, 95th Cong., 2d Sess. 64, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5850.

[38] *Id.*

10

a true lease exists for purposes of the Bankruptcy Code."[39]  While recognizing that "These cases are not dispositive of the *sui generis* property interest embodied in this agreement,"[40] they provide "a framework for analysis."[41]

The court noted that the lease was unusual and did not contain executory burdens.  The lease arose under "unique circumstances"[42] and the nature of the transaction was "peculiar."[43]  The Ninth Circuit related the history of the transaction and the fact that rental payments stopped when the bonds sold by the Market Corporation had been retired.  The court also stated:

> No true landlord/tenant relationship was ever intended or created.  The Produce Terminal was created to allow the City to fulfill its legal obligation to provide relocation space to the displaced businesses.  The displaced businesses were grouped together in a cooperative fashion and charged only with the responsibility to pay for the costs of relocation and economically coexist with each other.[44]

---

[39] *City of San Francisco Market Corporation v. Walsh (In re Moreggia & Sons, Inc.),* 852 F.2d 1182-1183 citing *Liona Corp., N.V., v. PCH Associates (In re PCH Associates),* 804 F.2d 193 (2nd Cir. 1986) and *In re Independence Village, Inc.,* 52 B.R. 715 (Bankr. E.D. Mich. 1985).

[40] *City of San Francisco Market Corporation v. Walsh (In re Moreggia & Sons, Inc.),* 852 F.2d at 1183.

[41] *Id.*

[42] *City of San Francisco Market Corporation v. Walsh (In re Moreggia & Sons, Inc.),* 852 F.2d at 1184.

[43] *Id.*

[44] *Id.*

The Ninth Circuit found that the debtor's remaining financial obligations under the lease were *de minimus* when compared with the value of the remaining possessory interest in the stalls, $210,000. The court also concluded that the legislative purposes of § 365(d)(4) would not be served by adopting the Market Corporation's position. "The Market Corporation has suffered no delay, uncertainty, or other harm as a result of the failure to assume expressly the lease within the 60 day period."[45]

In its final argument, the Ninth Crcuit endorsed the equitable powers of bankruptcy courts. It found that a forfeiture of a $210,000 property interest would be inequitable under the circumstances.[46]

The Ninth Circuit cited *Liona Corp., N.V., v. PCH Associates (In re PCH Associates)*[47] in support of its decision.[48] It agreed with the *PCH* analysis of 11 U.S.C. §§ 502(b)(6) and 365 as being parts of a total scheme to set forth the rights of landlords and tenants.[49] It concurred with the Second Circuit's finding that § 365 leases had to be true or bona fide leases based on the economic substance of the transaction.[50]

---

[45] *City of San Francisco Market Corporation v. Walsh (In re Moreggia & Sons, Inc.),* 852 F.2d at 1185.

[46] *City of San Francisco Market Corporation v. Walsh (In re Moreggia & Sons, Inc.),* 852 F.2d at 1185-1186.

[47] 804 F.2d 193 (2nd Cir. 1986).

[48] *City of San Francisco Market Corporation v. Walsh (In re Moreggia & Sons, Inc.)*, 852 F.2d at 1182.

[49] *Id.*

[50] *City of San Francisco Market Corporation v. Walsh (In re Moreggia & Sons, Inc.),* 852 F.2d at 1182-1183.

In *PCH* the court was dealing with a sale–leaseback agreement and a ground lease.  Land owned by PCH, but not the improvements, was sold to a third party and immediately leased back to PCH for tax and investment advantages.  The ground lease had a term of up to 165 years.  PCH filed for Chapter 11 relief.  Liona, the landlord, filed a motion to require PCH to make lease payments under the terms of the ground lease.  The bankruptcy court and district court found that the true nature of the transaction was that of a joint venture and no landlord-tenant relationship existed.

The Second Circuit affirmed.  It found that merely labeling the transaction as a lease was not determinative of the controversy.  The parties choice of a label did not affect the rights of third party creditors.  The court cited a number of factors indicating that the lease in question was not a true lease.  The court determined that property purchased by a lessor specifically for the lessee's use tends to prove that no true lease exists.[51]  Additionally, the fact that the purchase price was not related to the value of the land was a factor.[52]  The fact that the lessee assumed many of the obligations associated with outright ownership of the property including the payment of taxes and insurance was a factor.[53]  The court also considered provisions:  (1) allowing the landlord to recover its investment if the hotel were refinanced; and (2) allowing pre-payment of Liona's investment while Liona received a share of the profits.  These provisions were also indicative of something other than a lease.  The

---

[51] *Liona Corporation, N.V., v. PCH Associates (In re PCH Associates)*, 804 F. 2d at 200-201.

[52] *Liona Corporation, N.V., v. PCH Associates (In re PCH Associates),* 804 F.2d at 201.

[53] *Id.*

13

court concluded that the lease was not a true lease for § 365 purposes. Whether the contracts created a joint venture or some other form of investment vehicle was left undecided.

The Ninth Circuit also cited a Michigan bankruptcy case in support of its decision. In *In re Independence Village*,[54] the court found a lease purchase contract to be an equitable mortgage. Rental payments were identical to the principal, interest and other expenses incurred by the landlord as a legal consequence of its obligation to pay bondholders. After paying the rental obligations, the debtor was entitled to a deed to the real property by paying the sum of $100.00. The court found that § 365 did not apply to the transaction based upon the intentions of the parties and the economic substance of the transaction.

Alaska Law

*Moreggia* requires courts to first determine whether a lease is a valid unexpired lease of non-residential real property under state law prior to analyzing the lease under § 365(d). U.S. Bank cites three Alaska state court decisions for its contention that the land lease is not a valid Alaskan lease. None of them interpreted nonresidential leases of real property, however. In *Sisters of Providence in Washington, Inc. v. Municipality of Anchorage*,[55] the Alaska Supreme Court found that Providence Hospital's leasehold interest in beds, televisions and x-ray equipment was not exempt from taxation. *Western Enterprises,*

---

[54] 52 B.R. 715 (Bankr. E.D. Mich. 1985).

[55] 672 P.2d 446 (Alaska 1983).

14

*Inc v. Arctic Office Machines, Inc.*[56] was a dispute over leased office furniture. The court concluded that even if an option price at the end of a personal property lease term was not nominal, a court could construe a lease of furniture as a purchase agreement. It remanded the case for further proceedings. *Berger v. State of Alaska*[57] was a suit by a purchaser of 3000 PFDs against the department of Revenue. The court noted that disguised usurious loans could be "pierced" to determine their true nature. It ultimately concluded, in a 3-2 split decision, that the Alaska Small Loans Act did not apply to Berger's purchase of PFDS. I didn't find U.S. Bank's selective quotes from these personal property cases to be persuasive regarding a ground lease of real property.

ACD recognizes that Alaska has no current statutory or case law establishing the hallmarks of a true lease of real property. It contends that Alaska would likely apply the common law of other states and the Uniform Commercial Code. While I don't find the UCC argument persuasive, I agree that Alaska would likely apply the common law of other states. California has well developed case law defining the essential elements of a real property lease. Alaska has but one pre-statehood case that defines a lease of real property, and that decision is enigmatic.

In *Femmer v. City of Juneau*[58] the Ninth Circuit reviewed an agreement for the use of a Juneau wharf. It concluded that the City of Juneau had not entered into a lease with

---

[56] 667 P.2d 1232 (Alaska 1983).

[57] 910 P.2d 581 (Alaska 1996).

[58] 9 Alaska 315, 97 F.2d 649 (9th Cir. 1938).

15

a shipping company.  Rather, the company had a mere license to use the wharf.  The Ninth

Circuit stated:

> However, it is argued that the agreement
> amounted to a lease.  With this contention we do
> not agree.  Northland was not given a right to
> possession of the wharf or any part thereof but
> merely a permission to use it for a limited
> purpose– a purpose entirely consistent with its
> intended use.   Bouvier's Law Dictionary,
> Rawle's Third Rev., defines a lease as: 'a species
> of contract for the possession and profits of lands
> and tenements either for life or for a certain
> period of time, or during the pleasure of the
> parties.'. . . We think that Northland is a mere
> licensee under the challenged contract.[59]

Certainly the Sportsplex land lease is a species of contract for the possession and profits of

land and tenements over a 50 year term.  Even U.S. Bank does not contend that Sportsplex

is a mere licensee.

Although the Alaska Supreme Court has failed to provide a more nuanced

definition of a lease of real property since statehood, I believe it would follow the lead  of

California appellate courts in defining the essential elements of a lease.  "[A] lease is nothing

other than an instrument by which one is granted, upon stated terms and conditions, *a right

to occupy a parcel of land to the exclusion of the grantor."[60]*  Additionally, "[a] lease must

include a definite description of the property leased and an agreement for rental to be paid

---

[59] *Femmer v. City of Juneau,* 97 F.2d at 657.

[60] (Emphasis in original), *Bachenheimer v. Palm Springs Management Co.,* 116 Cal.App. 2d  580, 581, 254 P.2d 153 (1953) as cited in *In re SCCC Associates II Limited Partnership*, 158 B.R. 1004, 1013 (Bankr. N.D. Cal. 1993).

16

at particular times during a specified term."[61]   Sportsplex has the right to occupy the dome

property exclusive of ACD.[62]  The land lease contains a description of the property.[63]  It also

provides for rental to be paid at particular times.[64]  When confronted with the issue, I believe

the Alaska Supreme Court would conclude that the land lease is a valid lease under Alaska

law.[65]

I  agree with ACD that "Congress has generally left the determination of

property rights in the assets of a bankrupt's estate to state law."[66]  Without *Moreggia, PCH*

and *Independence Village* my review of the land lease for purposes of § 365 should end here.

I am required to look further, however, to determine the economic substance of the

---

[61] *O'Shea v. Claude C. Wood Co.,* 97 Cal.App.3d 903, 909-910, 159 Cal.Rptr. 125, 128 (1979) as cited in *In re SCCC Associates II Limited Partnership,* 158 B.R.. 1004, 1013 (Bankr. N.D. Cal. 1993).

[62] Article XIV of the land lease (ACD Exhibit 1) does provide the landlord reasonable access for repairs and inspection.

[63] Article I of the land lease (ACD Exhibit 1) describes the property to be  leased.

[64] Articles III and IV of the land lease (ACD Exhibit 1) describe rental payments to be made.  U.S. Bank argues that the payment of taxes cannot be considered the payment of rent, citing AS 34.03.360.  That statute is part of the Uniform Residential Landlord and Tenant Act.  It applies to the rental of dwelling units under AS 34.03.010(b)(1).  It has no application to ground leases of non-residential real property.

[65] 49 AmJur 2d, Landlord and Tenant, § 22 (Thomson-West 2006) recognizes four essential terms necessary to create a valid lease.  They include: (1) the name of the parties; (2) a description of the demised realty; (3) a statement of the term of the lease; and (4) the rent or other consideration.  These essential terms are found in the land lease.

[66] *Gaughan v. Dittlof Revocable Trust (In re Costas),* 555 F.3d 790,793 (9th Cir. 2009), *citing Butner v. United States,* 440 U.S. 48, 54 (1979) and *Barnhill v. Johnson,* 503 U.S. 393, 398 (1992).

transaction.  U.S. Bank, as the party challenging the bona fides of the land lease, carries a

substantial burden of proof.[67]


Economic Substance

The Ninth Circuit concluded the Moreggia lease created an interest other than

a bona fide leasehold.  "Moreggia's interest is a prepaid right of possession for a substantial

future term (through the year 2013), with no *material* future obligations."[68]  The economic

substance of the agreement, a prepaid right of possession, was not a lease subject to § 365.

In *PCH*  the second circuit was coy.  Although the bankruptcy court and the district court

held that a ground lease and sale-leaseback documents contemplated a joint venture rather

than a typical lease,  it refused to go that far.

> Although we agree with the determination that the
> Ground Lease is not a lease, our analysis is
> somewhat different.   We interpret section
> 365(d)(3), (4) of the Bankruptcy Code to apply
> solely to a "true" or "bona fide" lease.   The
> Ground Lease is not, in our opinion, a true lease
> as contemplated therein and we find that
> determination dispositive of the case.   It is
> unnecessary, therefore, to identify the transaction
> as a joint venture, security agreement,
> subordinated financing, or other investment

---

[67] *In re Integrated Health Services, Inc.,* 260 B.R. 71, 75 (Bankr. D. Delaware 2001) citing *Liona Corp. v. PCH Associates (In re PCH Associates),* 804 F.2d 193, 200 (2nd Cir. 1986) and *Barney's Inc. v. Isetan  Co. Ltd. (In re Barney's Inc.),* 206 B.R. 328, 332 (Bankr. S.D.N.Y. 1997).

[68] (Emphasis in original)  *City of San Francisco Market Corporation  v. Walsh (In re Moreggia & Sons, Inc.),* 852 F.2d at 1186

> scheme.  Suffice it to say that it is not a bona fide
> lease for purposes of the Bankruptcy Code.[69]

The economic substance of the PCH ground lease and sale-leaseback was not a joint venture, but it was not a bona fide lease either.  The Second Circuit refused to commit.  The *Independence Village* court, also cited with approval in *Moreggia*, was much more straightforward.  There the economic substance of a lease-purchase agreement with a $100.00 purchase option, arising after full performance of a lease, was determined to be an equitable mortgage.[70]  Mortgages are not subject to section 365.

Gene Desjarlais created Anchorage Sportsplex, Inc. to build and run the dome. The ChangePoint entities have managed and directed the debtor through construction and initial operations, although Desjarlais has always played a major role.  The August 1, 2006 land lease was needed for Sportsplex to obtain construction financing from the bondholders. The fifty year term of the land lease was not distinctive or unusual, despite Mr. Minkemann's opinion to the contrary.[71]  There has been no testimony from Desjarlais or Merriner that they intended to establish anything other than a lease on behalf of their respective entities.  There is no $100.00 purchase option at the end of the lease term as in *Independence Village*.  The lease required prepaid rent of $1.2 million for the fifty year term.  This is similar to

---

[69] *Liona Corp., N.V., v. PCH Associates (In re PCH Associates),* 804 F.2d at 198-199.

[70] *In re Independence Village, Inc.,* 52 B.R. at 720.

[71] ACD's Exhibits 15 through 21 impeached his testimony.  His testimony was also contrary to a treatise on commercial ground  leases: *Commercial Ground Leases,* by Jerome D. Whalen, § § 8.6, 8.6.1, 8.6.2 (2d Ed. 2010).

Moreggia's prepaid right of possession.    Unlike Moreggia, however, Sportsplex has a number of continuing material future obligations under the land lease.  They include:  (1) the payment of taxes on the dome property (currently over $200,000 yearly);  (2) the operation of a multi-purpose sports facility at the dome; (3) payment of all utilities; (4) payment of all insurance; (5) surrender of the premises and the improvements at the end of the term; and (6) payment of any other costs associated with use of the facilities.[72]

Although the *PCH* court was unwilling to join lower courts and label a ground lease and a sale-leaseback as a joint venture rather than a lease, the rationale behind its conclusion is instructive.

> [R]ent was not calculated to compensate Liona for the use of the property; rather the parties structured the "rent" solely to ensure Liona's return on its investment.    Furthermore, the "purchase price" paid by Liona for the land was not based on the market rate, but was calculated as the amount necessary to finance the transaction. . . . It seems clear that no true lease was contemplated by the parties here.   It is undisputed that Bernstein, acting for PCH, initiated the entire transaction, including the purchase of the land by Liona. . . . [73]

Rent here was not calculated to compensate ACD for use of the property.  Rather, ACD voluntarily donated $3.8 million of leasehold value for the benefit of the Anchorage community.  Return on investment was never an issue.  ACD simply wanted to have enough

---

[72] ACD Exhibit 1.

[73] *Liona Corp., N.V., v. PCH Associates (In re PCH Associates),* 804 F.2d at 200.

20

cash available to complete improvements to the Alaska Seafood building, $1.2 million. ACD did not purchase the property solely for the benefit of Sportsplex. Sportsplex was just part of a larger transaction: the acquisition of the Alaska Seafood building and grounds for use as a church. There is no evidence that ACD paid over or under the market rate for the entire property or the Sportsplex parcel. No one person orchestrated the entire series of transactions.

The Second Circuit contends that a large discrepancy between the purchase price and the value of land is an indication that the transaction was a disguised financing scheme.[74] U.S. Bank has not submitted evidence of such a discrepancy. If anything, the Sportsplex lease is the inverse of a disguised financing scheme. ACD gave away $3.8 million in leasehold value for the benefit of Sportsplex and Sportsplex has no purchase option. The Sportsplex lease is not a disguised financing scheme.

The Second Circuit contends that assumption of the obligation to pay taxes and insurance by a lessee indicates that the lease is a financing transaction rather than a true lease.[75] Unquestionably, the Sportsplex land lease calls for Sportsplex to pay taxes,

---

[74] *Liona Corp., N.V., v. PCH Associates (In re PCH Associates),* 804 F.2d at 201.

[75] *Id.*

insurance and other obligations.[76] Sportsplex has no purchase option, however, and the other

PCH factors for establishing a true lease are inapplicable.[77]

Nonetheless, U.S. Bank maintains that under the totality of the circumstances

the economic substance of the land lease and related documents establish something other

than a true landlord-tenant relationship.   It emphasizes the relationship between the

ChangePoint entities and its "puppet board" at Sportsplex.   Gene Desjarlais has never been

a puppet for ChangePoint.  Desjarlais has always been the dominant force behind the creation

and operation of the dome from its inception.  Without his loan the project would not have

been completed.   There is no evidence that other board members were  puppets at the

inception of the lease on August 1, 2006.  Differences between ChangePoint and Sportsplex

arose after execution of the lease regarding placement of advertising banners in the dome.

Additionally, Desjarlais was displeased with Clauson's statements regarding withdrawal of

a $1.5 million grant application from the State of Alaska.  Such differences provide no

equitable grounds for invalidating the land lease, however.

U.S. Bank offered the opinions of Russell Minkemann, C.P.A to support its

economic substance analysis.   Mr. Minkemann has long been employed by Alaska

bankruptcy trustees to prepare bankruptcy estate income tax returns.  He has expertise on tax

---

[76] In *Integrated Health Services, Inc.*, 260 B.R. 71, 77 (Bankr. D.Del. 2001), the court found that "[A] triple net lease is not an unusual term in a true lease."

[77] The Second Circuit also found that provisions allowing the landlord to recover its investment if the hotel were refinanced and allowing prepayment of the landlord's investment for a share of future profits were indicative of something other than a lease.  Those provisions don't exist here.

issues.  He lacks expertise regarding commercial leases, however, as  Mr. Lewis's deft cross-examination conclusively established.   Mr. Minkemann was ignorant of  a number of long-term commercial leases in the Anchorage bowl.  They include: (1) a fifty year lease with five five year extensions between Hickel Investment Company and Town Center Holdings dated May 1, 2008;[78] (2)  a twenty-five year lease with 7 ten year extensions between  the Calais Company and Wal-Mart stores dated December 16, 1992;[79] (3)  an eighty-eight year term lease between the Calais Company and Alaska Pacific Bancorporation dated March 29, 1985;[80] (4)  a thirty five year lease with 2 ten year extensions between the Calais Company and Johnson's Tire Service, Inc. dated October 1, 1993; [81]  (5) a twenty-five year lease with 7 ten year extensions between the Calais Company and Wal-Mart Stores dated Nov. 16, 1992; [82]  (6) a fifty year lease with three ten year extensions between the Calais Company and Nana-Marriott Properties II dated May 23, 1997;[83]  (7) a ninety-four year lease  between the Calais Company and Calais Office Center II originally dated June 17, 1975;[84] and (8) a fifty-five year lease between the Alaska Railroad Company and Alaska Distributors Company

---

[78] ACD Exhibit 15.

[79] ACD Exhibit 16.

[80] ACD Exhibit 17.

[81] ACD Exhibit 18.

[82] ACD Exhibit 19.

[83] ACD Exhibit 20.

[84] ACD Exhibit 21.

originally dated October 13, 1964.[85]  Mr. Minkemann's opinion that the ACD-Sportsplex land lease transaction was a sale is entitled to no weight.

Additional Authorities

U.S. Bank has cited a number of additional cases in support of its position, all of which are distinguishable from the instant case.  *City of Olathe, Kansas v. KAR Development Associates (In re Kar Development Associates)*[86] involved a sale-leaseback arrangement.  The court determined that a lease with purchase option was not a true lease but instead a disguised security agreement.  It is distinguishable because there was no sale-leaseback or purchase option in the ACD-Sportsplex lease.  In *International Trade Administration v. Rensselaer Polytechnic Institute*[87] the Second Circuit determined that a 99 year lease with prepaid rent over the first three years was not a true or bona fide lease.  It is distinguishable because of the 99 year term of the lease and the fact that immediate surrender of the premises to Rensselaer would have lead to a grossly inequitable "windfall."  In *United Airlines, Inc. v. HSBC Bank USA, N.A.,*[88] the Seventh Circuit found a 36 year sublease-leaseback arrangement was a secured loan and not a lease for purposes of section 365.  Here there was no sublease-leaseback arrangement.

---

[85] ACD Exhibit 22.

[86] 180 B.R. 629 (D. Kansas 1995).

[87] 936 F.2d 744 (2nd Cir. 1990).

[88] 413 F. 3d 609 (7th Cir. 2005).

There are a number of additional decisions that are relevant to the lease-true lease distinction.   In *Integrated Health Services, Inc.,*[89] a Delaware bankruptcy court found that yearly lease arrangements were true leases.   There was no purchase option at the end of the term and its triple net provisions were not unusual in true leases.[90]   A Michigan bankruptcy court in *In the Matter of Lansing Clarion Limited  Partnership*[91] found a thirty year triple net lease to be a bona fide lease under § 365.   "[W]hat is denominated or labeled as a lease is presumed to be a true lease absent compelling factors to the contrary."[92]   In a Northern California bankruptcy case,  *In re SCCC Associates II Limited Partnership,*[93] a bankruptcy judge determined that a fifty year ground lease with four additional ten year renewals was a true lease.   The debtor did not receive a purchase option, only a right of first refusal.  The court found allegations of a joint venture or a disguised security agreement were unfounded.

Equity and Legislative Purpose

U.S. Bank  has lost sight of a major factor underlying the *Moreggia* decision. The court did not look solely to the unusual nature of the lease.  The unusual nature of the

---

[89] 260 B.R. 71 (Bankr. D. Del. 2001).

[90] *In re Integrated Health Services, Inc.* 260 B.R. at 77.

[91] 132 B.R. 845 (Bankr. W. D. Mich. 1991).

[92] *In the Matter of Lansing Clarion Limited Partnership,* 132 B.R. at 850.

[93] *In re SCCC Associates II Limited Partnership*, 158 B.R. 1004 (Bankr. N.D. Cal. 1993).

25

lease had to be coupled with the appropriate use of a bankruptcy court's equitable powers. The Ninth Circuit found that a forfeiture of $210,000 after full performance of a lease based upon a failure to assume was grossly inequitable. There is no forfeiture in this case, however. Nor has there been full performance of the lease by the debtor.  There is nothing grossly inequitable about requiring Sportsplex to pay taxes as they become due.  U.S. Bank has failed to establish a vital link required by the *Moreggia* court to invalidate a lease.

Additionally, the Ninth Circuit found that the legislative purposes of § 365(d)(4) would not be harmed by a Chapter 7 trustee's failure to promptly assume the Market Corporation lease within a sixty day period.  Here the legislative purpose of 11 U.S.C. § 365(d)(3) is clear on its face:  to unequivocally require debtors and trustees to timely pay all post-petition obligations of nonresidential real property leases until the lease is assumed or rejected.  That purpose will be harmed if Sportsplex is allowed to skip its tax payments prior to acceptance or rejection of the lease.

I conclude that U.S. Bank's reliance on *Moreggia* is misplaced.  The facts and rationale of that decision are clearly distinguishable from the present case.  It does not provide a basis for this court to cast aside the land lease between ACD and Sportsplex to create a sale, a financing transaction, a fee simple determinable, a joint venture or any other non-lease relationship that U.S. Bank views as equitable.  I determine that the economic substance of the land lease is that of a lease.


Pro-Ration of Taxes

26

U.S. Bank argues that this court should pro-rate taxes based upon the petition date under *Handy Andy Home Improvement Centers, Inc.*[94]  I prefer the approach taken by the Third Circuit in *CenterPoint Props. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.).*[95]  The debtor will be required to pay all 2010 taxes due the Municipality.

---

[94] 144 F.3d 1125 (7th Cir. 1998).

[95] 268 F.3d 205 (3rd Cir. 2001).

Conclusion

      ACD's motion for payment of taxes and adequate protection will be granted.

An appropriate order will be entered.

DATED: December 13, 2010.

BY THE COURT

 /s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:      D. Bundy, Esq.
            P. Weiss, Esq.
            D. Ennis, Esq.
            E. Schaffer, Esq.
            J. Siemers, Esq.
            S. Lewis, Esq.
            K. Hill, Esq.
            K. Black, Esq.

12/13/10